951 F.2d 1261
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Charlie PHIPPS, Jr., Defendant-Appellant.
 No. 90-5030.
 United States Court of Appeals, Tenth Circuit.
 Dec. 10, 1991.
 
 Before JOHN P. MOORE and BRORBY, Circuit Judges, and JENKINS,* Chief District Judge.
 ORDER AND JUDGMENT**
 BRORBY, Circuit Judge.
 
 
 1
 In this case, a companion to United States v. Simpson, --- F.2d ---- (No. 90-5032, 10th Cir. Dec. 10, 1991), Mr. Phipps challenges his convictions of twenty-six criminal charges, including one count of conspiracy, twenty-two counts of wire fraud, and three counts of misapplication of bank funds. Mr. Phipps asserts insufficiency of the evidence, juror misconduct and error in sentencing. We affirm.
 
 Background
 
 2
 Simply for the purpose of enabling the reader to understand the issues without a full statement of the many complex facts, we summarize and characterize this case by stating that Mr. Phipps agreed to participate in the purchase of the controlling capital stock of an Oklahoma bank operating under a regulatory cease and desist order. The agreed upon purchase price greatly exceeded the bank's book value. Mr. Phipps paid for this stock, not with his funds, but rather by using brokered funds that had been deposited in the bank by third persons and wrongfully diverted by the bank's CEO into a checking account controlled by Mr. Phipps. Mr. Phipps also used the diverted, brokered funds to pay the costs of attracting the third-party bank deposits and to pay himself and others consulting fees. The criminal charges arise from this series of transactions.
 
 
 3
 * Sufficiency of the Evidence
 
 
 4
 Mr. Phipps attacks his conspiracy conviction by asserting there existed no evidence of either an agreement or of his intent. He attacks his twenty-two wire fraud convictions by asserting there was no evidence of his intent. He attacks his three misapplication of bank funds convictions by contending there was no evidence the bank was federally insured and by asserting there was no evidence of his intent. We deal with each attack separately.
 
 
 5
 When we review a claim of insufficient evidence we look at all of the evidence, both direct and circumstantial, and we look at the reasonable inferences that can be drawn from this evidence in a light that is most favorable to the Government. We must affirm the conviction if the record contains evidence that would allow a rational jury to find Mr. Phipps guilty of the charge.
 
 A. The Conspiracy Agreement:
 
 6
 It is elemental that a conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. The gist of the offense is a combination or agreement to violate the law and this is the factual element Mr. Phipps asserts is lacking in the evidence used to convict him.
 
 
 7
 A conspiracy agreement may be inferred from statements, acts and circumstances and may be proved by circumstantial evidence. Reviewing the record we find abundant circumstantial evidence to support the jury's finding that an agreement to violate the law existed.
 
 
 8
 On January 21, 1986, Mr. Phipps executed an agreement in his corporate capacity to purchase control of the bank for a price far in excess of its fair market value. The seller was Mr. Simpson, the bank's CEO. On January 22, 1986, the very next day, Mr. Phipps caused a checking account to be opened in the bank so incoming wire transfers of third-party deposits could be placed therein. On January 22 and 23, $1.2 million of deposits received from third persons were transferred into this account upon the orders of Mr. Simpson. None of the depositors had authorized a transfer of their funds into Mr. Phipp's account, and no deposits were made into this checking account except monies from the third-party depositors. Within this same time frame, i.e., January 22 through January 24, Mr. Phipps drew checks on this account, paying Mr. Simpson $900,000 for his stock. Again within this same time frame, i.e., January 22 and 23, Mr. Phipps drew checks on this account to pay money brokers for obtaining the third-person deposits. Mr. Phipps also caused $25,000 to be withdrawn from this account and paid to himself on January 22, which was the first day the account contained funds. A reasonable inference to be drawn from this evidence is there existed an agreement at least between Mr. Simpson and Mr. Phipps to violate the law. Mr. Simpson and Mr. Phipps both received monies to which they were not entitled within twenty-four hours of their "buy-sell" agreement. Their receipt of funds would not have been possible but for their concerted, combined, and sequentially orchestrated actions. The evidence clearly establishes an agreement to convert third-persons' money to their own use unlawfully. There exists overwhelming additional circumstantial evidence of the existence of a conspiracy agreement, which we see no reason to further detail.
 
 B. Conspiracy Intent:
 
 9
 To convict of a conspiracy the record must contain evidence establishing an intent to agree and an intent to achieve the object of the agreement. Mr. Phipps argues that as there existed no showing of an agreement, there can exist no intent to conspire. This argument fails as we have found more than sufficient evidence to support the existence of a conspiracy agreement.
 
 C. Wire Fraud Intent:
 
 10
 To convict of wire fraud it must be shown the defendant had a specific intent to engage in a scheme or artifice to defraud. The requisite intent may be inferred from the facts and circumstances surrounding the transaction.
 
 
 11
 Mr. Phipps asserts the record contained no evidence showing deception or false statements constituting specific intent to engage in a scheme to defraud.
 
 
 12
 The record abounds with Mr. Phipps' deceptive and false statements. We will not attempt to detail all; however, Mr. Phipps' statements to the bank's board of directors on January 21 are illustrative. On that date he represented he would establish an investment program for bank funds that would adhere to the bank's investment policy and comply with regulatory guidelines. No effort was made to assure such compliance. Mr. Phipps also misrepresented the source of deposits he would generate for the bank. Through his money brokers, Mr. Phipps represented to third-party depositors what the bank would pay without authorization or even knowledge of the bank's board of directors. Furthermore, Mr. Phipps failed to disclose to the depositors that their money would end up in a checking account controlled by him and used for his benefit.
 
 
 13
 From this and other evidence presented at trial, the jury could reasonably determine beyond a reasonable doubt that Mr. Phipps had the requisite intent to engage in a scheme to defraud the bank.
 
 D. Misapplication of Bank Funds:
 
 14
 Mr. Phipps asserts the record contained no evidence showing he had the requisite intent to aid and abet in the misapplication of bank funds. He asserts the most that can be said is "mere maladministration." This argument merits little discussion. The evidence clearly establishes bank funds were placed into the checking account controlled by Mr. Phipps and spent for his benefit. Mr. Simpson was the bank's CEO and placed the bank's funds into this checking account thereby converting these funds for the use of Mr. Phipps, a third party. Mr. Phipps never made any deposits to this account. He had full knowledge of and participated in Mr. Simpson's willful misapplication. Mr. Phipp's argument defies credulity.
 
 E. Proof of Bank's Status:
 
 15
 Concerning the misapplication of bank funds, it is essential for the Government to prove the bank was an FDIC insured bank. The Government proved this federal nexus through the testimony of Mr. Stoner, the bank president, and by the testimony of a federal bank examiner.
 
 
 16
 Mr. Phipps, without the benefit of supporting authority, claims that mere testimony "does not rise to level of proof needed to establish that the bank was an FDIC institution", an argument we reject. See United States v. Darrell, 828 F.2d 644, 648 (10th Cir.1987), and United States v. Phillips, 606 F.2d 884, 887 (9th Cir.1979), cert. denied, 444 U.S. 1024 (1980), both holding that such testimony is sufficient to establish the institution is federally insured.
 
 II
 Juror Misconduct
 
 17
 Mr. Phipps raises the same factual and legal issues as were raised, discussed, and decided in Simpson. Mr. Phipps adds a new wrinkle by asserting codefendant Button (the defendant seen by one or more jurors in handcuffs) "was portrayed at trial as one of the very least culpable of the defendants" and "[t]his association is particularly damaging." This assertion does not change our analysis. Simpson is dispositive and no error exists.
 
 III
 The Sentence
 
 18
 Mr. Phipps asserts the sentencing court improperly considered hearsay evidence in the form of a letter to the probation office and denied him an opportunity to refute this evidence.
 
 
 19
 The letter in question surfaced during the sentencing hearing held on February 1, 1990. Mr. Phipps' counsel argued to the court that Mr. Phipps was not a flight risk nor a criminal risk and that he would never again be involved in such a transaction. The court told Mr. Phipps' defense counsel it had little confidence in the assertion that Mr. Phipps would not engage in such future transactions based upon a letter dated December 8, 1989, sent to the probation office. This letter identified Mr. Phipps as "General Counsel & Trustee" and suggested that Mr. Phipps was then engaging in similar transactions while confined to jail. The court read the damaging portion of this letter in open court.
 
 
 20
 Neither Mr. Phipps nor his counsel objected, denied the truth thereof nor asked for an opportunity to explain although defense counsel explained to the court he had "no such knowledge of that transaction." The court passed sentence and twice gave defense counsel the opportunity to speak by asking if he had anything further or anything else.
 
 
 21
 Phipps asserts his sentence was longer than those received by his codefendants and argues the letter was the cause. We are not persuaded by Mr. Phipps' assertions. Generally speaking, hearsay statements may be used by the sentencing court if they bear a reasonable indicia of reliability and if defendant's due process rights are preserved. United States v. Strayer, 846 F.2d 1262, 1267 (10th Cir.1988). Both conditions were fulfilled. The presentence report stated Mr. Phipps was "among the most culpable of those involved", which supports the court's lengthier sentence of Mr. Phipps. The total sentence received for all twenty-six counts was five years--well within the statutory limits and certainly not excessive under the facts of this case.
 
 
 22
 Mr. Phipps also complains he did not receive a two-point reduction in his offense level for acceptance of responsibility under the Sentencing Guidelines. Mr. Phipps was convicted and sentenced for offenses which took place prior to November 1, 1987, the effective date of the Sentencing Guidelines. We must therefore reject this argument.
 
 
 23
 The Judgment and Sentence is AFFIRMED.
 
 
 
 *
 The Honorable Bruce S. Jenkins, Chief Judge, United States District Court for the District of Utah, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3